UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ANGEL CARROLL, JESSICA COHEN, and JILL VAN VOORHIS,<br><br>Plaintiffs,<br><br>v.<br><br>THE TEXAS STATE PRESERVATION BOARD, through<br>GREG ABBOTT, in his official capacity as Chairman of the Texas State Preservation Board;<br>DAN PATRICK, in his official capacity as Co-Vice Chairman of the Texas State Preservation Board;<br>DUSTIN BURROWS, in his official capacity as Co-Vice Chairman of the Texas State Preservation Board;<br>CHARLES SCHWERTNER, in his official capacity as member of the Texas State Preservation Board;<br>CHARLIE GEREN, in his official capacity as member of the Texas State Preservation Board;<br>ALETHEA SWANN BUGG, in her official capacity as citizen member of the Texas State Preservation Board; and<br>JOHN DOE DPS OFFICER in his individual capacity,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 1:26-cv-01169 |

## PLAINTIFFS' ORIGINAL COMPLAINT

On the evening of August 19, 2025, three Texas women—an advocacy director, a Democratic Party official, and a community organizer—sat peacefully outside the House chamber of the Texas State Capitol in protest of the confinement of a sitting state representative. Within

one minute of taking their seats, they were arrested. Hours later, each received a criminal trespass notice banning her from the Capitol complex for one year.

Plaintiffs bring this action to vindicate their First and Fourteenth Amendment rights. The criminal trespass notices are unconstitutional on their face—they vest state officers with unconstrained discretion to impose year-long exclusions from the seat of Texas government without any procedural safeguard or articulable standard. They are unconstitutional as applied—imposed against peaceful political protesters in a traditional and designated public forum, without narrowly tailored justification, and without any opportunity to be heard. Plaintiffs seek declaratory and injunctive relief against the officials responsible for governing and securing the Capitol complex, and damages against the individual officer who directed the arrests and issued the trespass notices.

## JURISDICTION AND VENUE

1. Jurisdiction is proper in federal court because the claims arise under the United States Constitution and 42 U.S.C. § 1983. 28 U.S.C. § 1331.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the events complained of occurred in Travis County, Texas.

## PARTIES

3. Plaintiff Angel Carroll is the Director of Advocacy for a nonprofit organization based in Austin, Texas. Her professional responsibilities require regular access to the Texas State Capitol to advocate on behalf of constituents whose elected representatives do not maintain separate district offices outside the Capitol complex.

4. Plaintiff Jessica Cohen was the Vice Chair of the Travis County Democratic Party[1] and a Code representative of the Texas Democratic Party's LGBTQ+ Caucus at the time of the events described herein. Her official party duties require regular access to the Capitol.

5. Plaintiff Jill Van Voorhis is a community activist and organizer based in Austin, Texas.

6. The Texas State Preservation Board ("TSPB") is the state body responsible for the preservation, maintenance, and operation of the Texas State Capitol complex, including oversight of public access to the building and grounds. The TSPB's governing board consists of the officials named as Defendants below. Plaintiffs sue each TSPB board member in their official capacity for declaratory and injunctive relief only.

7. Defendant Greg Abbott is the Governor of Texas and serves as Chairman of the Texas State Preservation Board. He is sued in his official capacity only. He may be served at the Office of the Governor, State Insurance Building, 1100 San Jacinto, Austin, Texas 78701.

8. Defendant Dan Patrick is the Lieutenant Governor of Texas and serves as Co-Vice Chairman of the Texas State Preservation Board. He is sued in his official capacity only. He may be served at the Office of the Lieutenant Governor, Capitol Extension Room E1.006, Austin, Texas 78701.

9. Defendant Dustin Burrows is the Speaker of the Texas House of Representatives and serves as Co-Vice Chairman of the Texas State Preservation Board. He is sued in his official capacity only. He may be served at the Office of the Speaker, State Capitol Room 2W.13, Austin, Texas 78701.

---

[1] Cohen was subsequently elected to be Party Chair on March 3, 2026.

10. Defendant Charles Schwertner is a member of the Texas Senate and serves as a member of the Texas State Preservation Board. He is sued in his official capacity only. He may be served at the Texas Senate, Capitol Station, P.O. Box 12068, Austin, Texas 78711.

11. Defendant Charlie Geren is a member of the Texas House of Representatives and serves as a member of the Texas State Preservation Board. He is sued in his official capacity only. He may be served at the Texas House of Representatives, Capitol Station, P.O. Box 2910, Austin, Texas 78768.

12. Defendant Alethea Swann Bugg is the citizen member of the Texas State Preservation Board. She is sued in her official capacity only. She may be served through the Texas State Preservation Board, P.O. Box 13286, Austin, Texas 78711.

13. Defendant JOHN DOE DPS OFFICER, whose name is currently unknown but expected to be learned through discovery, is the Department of Public Safety supervisor who, at approximately 10:30 p.m. on August 19, 2025, warned Plaintiffs that they would be arrested and issued year-long criminal trespass notices if they did not leave, and who directed or authorized the arrest and issuance of those notices. He is sued in his individual capacity for damages, declaratory relief, and injunctive relief. He may be served at the Texas Department of Public Safety, 5805 N. Lamar Blvd., Austin, Texas 78752.

FACTS

**Background: The Detention of Representative Collier**

14. In August 2025, the Texas House of Representatives was engaged in a highly contentious dispute over a proposed mid-decade congressional redistricting plan. In an effort to block consideration of the legislation, Democratic members broke quorum by leaving the state, preventing the House from conducting business. House leadership responded by initiating

enforcement measures to compel Democrats to return and to prevent further quorum breaks. When Democratic members returned to the Capitol during a subsequent special session, House leadership imposed conditions to ensure their continued presence and compliance with House proceedings.

15. On August 18, 2025, Texas House Speaker Burrows required Democratic members returning to the House floor to sign documents authorizing DPS troopers to monitor their movements—documents colloquially referred to as "nanny papers." Representative Nicole Collier refused to sign the documents.

16. In response to Representative Collier's refusal, House leadership directed that she be confined inside the House chambers until she signed the paperwork, even if that confinement extended overnight.

**The Plaintiffs and Their Presence at the Capitol**

17. Angel Carroll is the Director of Advocacy for a nonprofit organization and was present at the Texas State Capitol throughout the day on August 18 and into the evening of August 19, 2025. Jessica Cohen was the Vice Chair of the Travis County Democratic Party and a representative of the Texas Democratic Party's LGBTQ+ Caucus. Jill Van Voorhis is a community activist and organizer.

18. At approximately 2:47 p.m. on August 19, Ms. Carroll was in the House gallery with Capitol staffers and journalists observing the floor proceedings. Capitol pages approached and directed them to leave without providing a reason. When a New York Times reporter pressed for an explanation, noting the matter was of public interest, he was told to go downstairs to the Sergeant-at-Arms' office. The Sergeant-at-Arms, Kara Coffee, stated that House Administration determined gallery hours and that because members had adjourned,

the gallery was closing—despite the fact that Representative Collier remained on the House floor and could not be observed via the live stream.

19. Beginning at approximately 6:00 p.m., word began circulating through Democratic Party networks that Representative Collier was being detained within the House chamber.

20. Between approximately 6:45 p.m. and 7:16 p.m., Ms. Cohen, Ms. Van Voorhis, and other community members arrived at the Capitol. They proceeded upstairs to the area outside the House chamber where Representative Collier was confined. The group engaged in peaceful chanting and demanded her release.

**DPS's Shifting Instructions and the Decision to Remain**

21. Between approximately 8:30 p.m. and 9:00 p.m., a DPS officer in charge informed the group that they could remain in the building while the Senate was in session, estimating that the Senate would not adjourn until between 2:00 and 3:00 a.m. However, at approximately 10:00 p.m., a DPS officer returned and informed the group that the Senate had adjourned early, the building would close at 10:30 p.m., and the group would be required to leave at that time.

22. Between approximately 10:15 p.m. and 10:30 p.m., the DPS presence inside the Capitol grew rapidly to approximately 20 to 25 officers who gathered outside the House chamber doors.

23. At approximately 10:30 p.m., Ms. Carroll, Ms. Cohen, and Ms. Van Voorhis did not leave. Each of them independently felt a personal and civic obligation to remain while Representative Collier was still confined in the chamber. They sat down in front of the House chamber doors as a peaceful act of protest and solidarity. Senator Molly Cook sat with them in solidarity.

**The Arrest and Issuance of Criminal Trespass Notices**

24. A DPS supervisor—described by multiple witnesses as an older white man wearing a cowboy hat—warned the seated protesters that they would be arrested and issued a one-year criminal trespass notice banning them from the Capitol if they did not leave.

25. At approximately 10:31 p.m., the DPS officers placed the women under arrest while they remained seated.

26. The arrested women were handcuffed and escorted out of the Capitol, each accompanied by two DPS officers. DPS printed and delivered trespassing citations to the group while they were detained outside the Capitol. Then, despite having already been cited, the women were transported to the Travis County downtown jail.

27. The women were booked at the Travis County Jail for a Class B misdemeanor. They were released at approximately 5:00 a.m.

**Dismissal of Charges; Continued Enforcement of the Bans**

28. The Travis County Attorney's Office subsequently declined to prosecute the criminal trespass charge.

29. Despite the dismissal of the charges, DPS's one-year criminal trespass notice remains in effect against each of the women. The ban prohibits them from entering the Capitol complex. This restriction directly impairs Ms. Cohen's ability to perform her duties as Chair of the Travis County Democratic Party and as a representative of the Texas Democratic Party's LGBTQ+ Caucus. It similarly impairs Ms. Carroll's professional responsibilities as a nonprofit advocacy director, particularly because her then-representative and the rest of the Central Texas Delegation do not maintain separate district offices and operate from within the Capitol complex.

**The Texas State Capitol as a Forum for Protected Expression**

30. The Texas State Capitol is not merely a site of formal legislative proceedings; it is a uniquely dynamic forum for expressive activity, where advocacy unfolds across a spectrum of settings—from intimate, one-on-one conversations to large-scale public demonstrations. At the smallest level, walking into a member's office presents a singular opportunity for constituents and advocates to engage directly with elected officials and their staff, fostering candid dialogue that cannot be replicated through remote communication. These in-person interactions allow for real-time exchange, nuance, and persuasion—features that explain why, during legislative sessions, advocates and lobbyists reliably converge on the Capitol rather than attempting to influence legislation from afar.

31. Beyond scheduled meetings, the Capitol's hallways function as a space of continuous, informal engagement. Advocates, legislators, and staff routinely encounter one another unexpectedly, creating opportunities for spontaneous discussion, coalition-building, and refinement of legislative ideas. These chance encounters—akin to the intellectual cross-pollination of a French salon or a seventeenth-century English coffeehouse—allow ideas to develop organically through repeated, iterative conversation. Walking the halls also enables advocates to identify emerging opposition to legislation, opening the door to immediate dialogue and potential compromise.

32. The expressive activity intensifies as one approaches the legislative chambers themselves. Observers may stand at the sidelines of the House and Senate chambers, where they engage in incidental conversations about ongoing debates, relay information, or pass notes to members during session—inviting them to step away and confer even in the midst of live

proceedings. These practices are not peripheral to the legislative process; they are integral to how legislation is shaped in real time.

33. At a more formal level, the Texas legislative process guarantees that every bill receives a hearing in each chamber, creating quintessential opportunities for members of the public and organized advocates to speak for or against proposed laws. These hearings are core expressive forums in which individuals may not only voice support or opposition but also persuade committees to amend legislation—ensuring that the lawmaking process remains responsive to public input.

34. Finally, the Capitol grounds themselves—particularly the Capitol lawn—serve as a highly trafficked venue for rallies, demonstrations, and other classic exercises of free speech. These large-scale gatherings amplify the voices of communities and signal collective political will, complementing the smaller-scale advocacy that occurs inside the building.

35. Taken together, these layered forms of engagement—from private conversations to public demonstrations—underscore the unique constitutional significance of the Texas State Capitol as a forum for speech, petition, and assembly. Restricting access to this environment does not merely limit physical presence; it disrupts the full range of expressive activity that defines democratic participation in Texas.

## CAUSES OF ACTION

Plaintiffs bring claims against Defendants for prior restraint of protected speech; restriction of speech in a public forum that cannot satisfy the applicable level of constitutional scrutiny; and deprivation of First Amendment rights without adequate procedural process, all pursuant to 42 U.S.C. § 1983.

**a. Prior Restraint on Speech in Violation of the First Amendment, 42 U.S.C. § 1983**

1. The First Amendment prohibits government actors from restraining protected expression before it occurs. Prior restraints bear a presumption against their constitutional validity. *Marceaux v. Lafayette City-Parish Consol. Gov't*, 731 F.3d 488, 493 (5th Cir. 2013). That presumption applies with full force when officials use facially neutral mechanisms to foreclose future expression. *Collins v. Ainsworth*, 382 F.3d 529, 539 (5th Cir. 2004).

2. Plaintiffs engaged in core political speech: peaceful protest and public advocacy inside the Texas State Capitol in response to the detention of a sitting state representative. Such expression—the direct observation and vocal protest of governmental action against an elected official—occupies the highest rung of First Amendment protection.

3. Defendants, acting under color of state law, imposed a continuing prior restraint on that expression by issuing criminal trespass notices banning each Plaintiff from the Capitol complex for a period of one year. Those notices do not merely respond to past conduct— they operate prospectively, categorically prohibiting Plaintiffs from entering the Capitol for any expressive purpose, at any time, regardless of whether any governmental interest is actually implicated at the moment of attempted entry, and thereby silencing speech before it occurs.

4. Defendants imposed these restraints without any procedural safeguards. There was no hearing, no notice, no standard, no criteria, and no procedure governing whether and under what circumstances DPS officers may issue year-long exclusions from the Capitol. Officers exercised unconstrained discretion to impose the ban on the spot. "[A] system of prior restraint avoids constitutional infirmity only if it takes place under procedural safeguards

designed to obviate the dangers of a censorship system." *Collins*, 382 F.3d at 539 (quoting *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975)).

5. Defendants are liable to Plaintiffs under 42 U.S.C. § 1983.

**b. Unconstitutional Restriction of Speech in a Public Forum—Failure to Satisfy Applicable Scrutiny, 42 U.S.C. § 1983**

### i. The Texas State Capitol Is a Traditional or Designated Public Forum

6. "[T]he existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 344 (5th Cir. 2001) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983)). The first inquiry is forum classification.

7. Traditional public forums are places that by long tradition have been devoted to assembly, public discourse, and the communication of views on matters of civic concern. Streets and parks are the paradigm examples, but the category is not limited to them—what matters is whether the property has historically served as a place for public expression on public affairs.

8. The Texas State Capitol and its publicly accessible areas—including the rotunda, corridors, galleries, the area outside the legislative chambers, and the Capitol grounds—have by long tradition and by governmental practice served as a locus for citizen assembly, legislative observation, and political advocacy. As set forth in the Facts above, that tradition spans the full continuum of expressive activity: constituents and advocates walk into members' offices for direct, in-person dialogue that cannot be replicated remotely; they traverse the hallways for the spontaneous encounters with legislators and staff that shape legislation in real time; they stand at the sidelines of the House and Senate chambers to pass notes, relay

information, and invite members to step away for discussion during live proceedings; they appear at statutorily guaranteed committee hearings to speak for or against pending bills; and they gather on the Capitol lawn for rallies and demonstrations that signal collective political will. Each of these forms of expression has been practiced at the Capitol for generations. That tradition is protected.

9. Alternatively, the Capitol's publicly accessible areas constitute a designated public forum. A designated public forum is created when the government intentionally opens a nontraditional forum for public discourse. The relevant inquiry is governmental intent, assessed by reference to the nature of the property, its pattern of use, and whether opening it for expressive activity is consistent with the government's purposes.

10. The Texas Capitol has been deliberately opened to the public for expressive activity. Members of the public are permitted and encouraged to attend committee hearings, observe floor proceedings from the galleries, meet with their representatives, and engage in the full continuum of advocacy and petition described above. The State has affirmatively invited citizens into the building for the purpose of civic participation. That invitation designates the forum.

11. In traditional and designated public forums, content-based restrictions must satisfy strict scrutiny: they must be necessary to serve a compelling governmental interest and narrowly drawn to achieve that end. Even content-neutral time, place, and manner restrictions must be narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication.

### ii.    The Restrictions Cannot Satisfy Any Level of Forum Scrutiny

12. Plaintiffs' expression—peaceful protest and advocacy directed at the unlawful confinement of an elected representative, conducted inside the Capitol while the legislature remained in session—is protected speech at the very core of the First Amendment. It involves a matter of the highest public concern: the use of state power to suppress political dissent.

13. Defendants imposed categorical restrictions on Plaintiffs' expression. The one-year Capitol bans are not targeted at specific disruptive conduct. They apply regardless of whether Plaintiffs would engage in any speech, regardless of whether the legislature is in session, and regardless of whether any governmental interest is actually implicated at the moment of attempted entry.

14. These restrictions are not narrowly tailored. Defendants possessed less restrictive means sufficient to address any legitimate governmental interest: they could have required Plaintiffs to leave for the evening; they could have imposed conditions on future access tied to specific conduct; they could have sought judicial relief. Instead, they imposed a blunt, year-long, total ban—precisely the kind of categorical exclusion that courts have consistently rejected as overbroad.

15. The restrictions also fail to leave open ample alternative channels for equivalent communication. The Capitol is not merely one forum among many—it is the only venue where the full continuum of democratic advocacy described above is available simultaneously. A constituent can walk from a private office meeting, to a chance hallway encounter with a key committee member, to testimony at a committee hearing, to a demonstration on the Capitol lawn, all in the course of a single day. No alternative channel replicates any individual layer of that continuum, let alone the whole. Email and telephone

calls cannot substitute for the in-person dialogue—with its capacity for real-time exchange, nuance, and persuasion—that explains why advocates converge on the Capitol during legislative sessions rather than lobbying remotely. Written comments cannot substitute for the spontaneous corridor conversations that allow advocates to identify emerging opposition and respond to it immediately. Virtual participation cannot substitute for physical presence at committee hearings, where a speaker's credibility, body language, and direct engagement with members carry persuasive weight that written submissions do not. Ms. Cohen's duties as Chair of the Travis County Democratic Party and LGBTQ+ Caucus representative require her personal presence at the Capitol. Ms. Carroll's advocacy on behalf of Central Texas constituents whose representatives maintain no separate district offices is impossible without Capitol access. Ms. Van Voorhis's political organizing depends on the full range of expressive opportunities the Capitol uniquely affords. The bans do not redirect Plaintiffs to other forums—they eliminate the irreplaceable forum where their expression has its constitutive democratic effect.

16. Defendants are liable to Plaintiffs under 42 U.S.C. § 1983.

### iii. In the Alternative: Defendants Cannot Satisfy Even Limited Public Forum Standards

17. Even if this Court were to characterize portions of the Capitol complex—including the corridor outside the House chamber where Plaintiffs were arrested—as a limited public forum rather than a traditional or designated one, Defendants' conduct cannot survive scrutiny. Plaintiffs assert this argument in the alternative only; it does not reflect their position that the Capitol or any of its publicly accessible areas is anything less than a traditional or designated public forum subject to strict scrutiny.

18. In a limited public forum, speech restrictions must be (1) viewpoint-neutral and (2) reasonable in light of the purpose served by the forum. The criminal trespass notices fail both prongs.

19. The notices are not viewpoint-neutral in effect. Plaintiffs were engaged in political protest against the actions of Republican House leadership at the moment of their arrest. DPS officers acted at the direction of or in coordination with House leadership, which had a direct interest in suppressing the viewpoint being expressed. The one-minute interval between Plaintiffs taking their seats in protest and their arrest, combined with the fact that they had been permitted to remain in the building for hours before adopting that expressive posture, gives rise to a strong inference of viewpoint-motivated enforcement that Defendants cannot dispel by invoking a facially neutral trespass statute.

20. The notices are not reasonable in light of the purpose served by the forum. The Capitol complex contains multiple distinct expressive sub-forums—galleries open to the public for legislative observation, committee hearing rooms where citizens testify on pending legislation, the rotunda and corridors where advocates and constituents engage with members and staff, and the Capitol grounds where demonstrations and rallies occur. Each of these sub-forums is open to every other member of the public. A restriction that categorically excludes specific individuals from the entire complex sweeps far beyond any legitimate governmental interest in managing the particular space where Plaintiffs' conduct occurred. As the court held in Wilson, a blanket facility-wide ban is unreasonable precisely because it forecloses access to the expressive sub-forums within that facility that remain open to the general public.

21. The individualized nature of the CTNs demands a more searching reasonableness inquiry. A restriction targeting the expressive activity of specific named individuals—rather than regulating access by the public generally—is the functional equivalent of an injunction against speech. Injunctions carry greater risks of censorship and discriminatory application than do general ordinances and require a standard of review "sufficiently rigorous" to account for those risks. Under that more rigorous standard, a total exclusion from the forum cannot survive unless no less restrictive alternative was available. Here, multiple less restrictive alternatives were readily at hand.

22. Defendants could have required Plaintiffs to leave for the evening without banning them for a year. They could have imposed conditions on future access tied to specific conduct rather than categorical exclusion. They could have limited any restriction to the area immediately outside the House chamber doors where the protest occurred, leaving Plaintiffs free to access every other expressive sub-forum in the complex. They could have sought judicial relief if they believed a longer-term restriction was warranted. They did none of these things. A "categorical ban on expressive speech singling out an individual does not even satisfy the lower threshold of reasonableness review."

23. Defendants are liable to Plaintiffs under 42 U.S.C. § 1983.

## c. Deprivation of First Amendment Rights Without Adequate Process in Violation of the Fourteenth Amendment, 42 U.S.C. § 1983

24. The Fourteenth Amendment prohibits the State from depriving any person of liberty without due process of law. The liberty interests protected by this guarantee include First Amendment rights. "[T]he liberty of speech and of the press which the First Amendment guarantees... is within the liberty safeguarded by the Due Process Clause of the Fourteenth Amendment from invasion by state action." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S.

765, 779 (1978). Individuals also have a constitutionally protected liberty interest in access to public places open to the general public.

25. The one-year Capitol ban imposed on each Plaintiff deprives her of both interests simultaneously: it extinguishes her ability to be present in a building open to the general public, and it eliminates her ability to engage in expressive activity in the central forum for political advocacy in Texas.

26. Plaintiffs received no process before this deprivation. There was no hearing, no notice, no standard, no criteria, and no procedure governing whether and under what circumstances DPS officers may issue year-long exclusions from the Capitol. Officers exercised unconstrained discretion to impose the ban on the spot.

27. The risk of erroneous deprivation under such an unconstrained system is severe. No protocol governed the decision; no official determined whether less restrictive measures would suffice; no policymaker reviewed the judgment before it was imposed. The absence of any pre-deprivation or meaningful post-deprivation process exposed Plaintiffs to precisely the kind of arbitrary governmental action the Due Process Clause exists to prevent.

28. Plaintiffs' interests are weighty. Their professional responsibilities, their roles as elected party officials, and their ongoing advocacy on behalf of their communities depend on Capitol access. The government's interest in maintaining order—whatever weight it deserves—is fully served by less restrictive measures that would not categorically silence their political voice for a year.

29. Defendants are liable to Plaintiffs under 42 U.S.C. § 1983.

**d. Qualified Immunity Does Not Shield Defendants**

30. To the extent any Defendant asserts qualified immunity, that defense fails. Qualified immunity is unavailable where a defendant violates "clearly established statutory or constitutional rights of which a reasonable person would have known."

31. The law governing criminal trespass bans imposed on individuals engaged in expressive activity in public forums has been clearly established in the Fifth Circuit and this District for years. By 2013, courts had held that banning a citizen from a governmental facility without narrowly tailored justification violates the First Amendment. By 2015, courts had held that a blanket trespass warning categorically excluding an individual from a limited public forum—even one issued in response to actual misconduct—fails constitutional scrutiny where less restrictive alternatives existed.

32. A reasonable officer would have known in August 2025 that issuing a one-year Capitol ban against individuals engaged in peaceful political protest, without any procedural safeguard or individualized justification, violated the First and Fourteenth Amendments. Defendants are not entitled to qualified immunity.

DECLARATORY AND INJUNCTIVE RELIEF

33. Plaintiffs incorporate by reference each of the preceding allegations as if fully set forth herein.

34. An actual and justiciable controversy exists between Plaintiffs and Defendants concerning the constitutionality of the criminal trespass notices issued on or about August 19, 2025. Defendants contend the notices were lawfully issued and remain in effect. Plaintiffs contend the notices violate the First and Fourteenth Amendments to the United States Constitution on their face and as applied.

35. The criminal trespass notices are unconstitutional as applied to Plaintiffs because: (a) they are not narrowly tailored to serve any compelling or significant governmental interest; (b) they foreclose Plaintiffs' access to the central forum for political expression in Texas without leaving open ample alternative channels of equivalent communication; and (c) they were imposed without any procedural safeguards or meaningful opportunity to be heard.

36. Plaintiffs are entitled to prospective injunctive and declaratory relief against the TSPB board member Defendants in their official capacities under *Ex parte Young*, 209 U.S. 123 (1908), which permits suits against state officials in their official capacities to enjoin ongoing violations of federal constitutional rights notwithstanding the Eleventh Amendment. The TSPB board member Defendants have a sufficient connection to enforcement of the challenged action for three independent and reinforcing reasons. First, under Texas Government Code 443.007(b)-(c), all powers related to the Capitol and its grounds are vested solely in the TSPB, and the Board has authority to adopt rules governing the buildings, their contents, and their grounds. Second, and most directly, Texas Penal Code 30.05(b)(2)(A) provides that a criminal trespass notice constitutes valid legal 'notice' only when given by 'the owner or someone with apparent authority to act for the owner.' The TSPB, as the entity vested by statute with authority over the Capitol complex and its grounds, is the owner or controlling authority for purposes of § 30.05 — meaning only the TSPB, or persons acting under its authority, may issue or rescind criminal trespass notices on Capitol grounds. A DPS officer who issued such a notice on Capitol grounds therefore did so as an agent of the TSPB, with apparent authority derived from the TSPB's ownership and control. Third, Texas Government Code 411.062(d) expressly provides that while DPS has primary responsibility for security on the Capitol Complex, "public use of the capitol,

the capitol extension, the capitol grounds, and the General Land Office building shall be governed by the State Preservation Board" — a statutory carve-out that removes public access determinations from DPS's unilateral authority and places them squarely within TSPB's jurisdiction. Section 411.062(e) further confirms that DPS "may enforce the rules of the State Preservation Board, adopted under Section 443.018," establishing that DPS's authority to exclude members of the public from Capitol grounds derives from and is subordinate to TSPB's governing authority. The board member Defendants therefore have both the legal authority and the affirmative obligation to direct that the unconstitutional notices be rescinded and that Plaintiffs' access to the Capitol be restored.

37. Pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57, Plaintiffs are entitled to a declaratory judgment that:

    (a) The criminal trespass notices issued to Plaintiffs Carroll, Cohen, and Van Voorhis on or about August 19, 2025 are unconstitutional as applied, in violation of the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983;

    (b) Defendants lacked constitutional authority to ban Plaintiffs from the Texas State Capitol complex in the manner and under the circumstances in which those bans were imposed; and

    (c) The continued enforcement of the criminal trespass notices against Plaintiffs violates the First and Fourteenth Amendments.

38. Plaintiffs satisfy each requirement for injunctive relief enjoining Defendants from enforcing the criminal trespass notices issued on or about August 19, 2025. First, Plaintiffs are substantially likely to succeed on the merits of their First and Fourteenth Amendment

claims, as described above. The bans were imposed against peaceful political protesters in a public forum without procedural safeguards. Courts have granted preliminary injunctions on materially indistinguishable facts.

39. Second, Plaintiffs will suffer irreparable harm absent injunctive relief. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); accord *Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 506 (5th Cir. 2009). That harm is not speculative. The bans presently prevent Ms. Cohen from performing her duties as Chair of the Travis County Democratic Party and as a representative of the Texas Democratic Party's LGBTQ+ Caucus, which require access to the Capitol. The bans presently prevent Ms. Carroll from conducting nonprofit advocacy on behalf of constituents whose representatives maintain no separate district offices outside the Capitol complex. The bans presently prevent Ms. Van Voorhis from engaging in the political organizing and direct advocacy for which the Capitol is the constitutionally appropriate forum. More broadly, the bans sever each Plaintiff from the only forum in which the full continuum of democratic advocacy—from private constituent meetings to spontaneous hallway encounters, committee testimony, and public demonstration—is available, a harm that cannot be remedied by any substitute channel of communication. Each day of continued enforcement is a day of irreparable constitutional injury.

40. Third, the balance of hardships favors Plaintiffs. Enjoining the enforcement of a constitutionally infirm ban imposes no cognizable hardship on Defendants—they retain full authority to respond to actual disruption through lawful, narrowly tailored means.

Plaintiffs, by contrast, suffer ongoing, concrete injury to their professional responsibilities and First Amendment rights every day the bans remain in force.

41. Fourth, the public interest strongly favors injunctive relief. "[I]njunctions protecting First Amendment freedoms are always in the public interest." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 298 (5th Cir. 2012) (quotation omitted). The public interest is also directly implicated here: the bans suppress political advocacy at the seat of Texas government and chill the expression of citizens who seek to hold their representatives accountable.

42. Plaintiffs therefore respectfully request that this Court issue preliminary and permanent injunctive relief:

(a) Enjoining Defendants, their officers, agents, employees, and all persons acting in concert with them, from enforcing the criminal trespass notices issued to Plaintiffs Carroll, Cohen, and Van Voorhis on or about August 19, 2025;

(b) Directing Defendants to rescind and void the criminal trespass notices issued to each Plaintiff; and

(c) Enjoining Defendants from issuing new criminal trespass notices against Plaintiffs based on the same underlying conduct, absent a material change in circumstances and the provision of adequate procedural process.

DAMAGES

43. Plaintiffs seek compensatory and punitive damages against Defendant(s) named in their individual capacities.

## NOMINAL DAMAGES

44. Plaintiffs request an award of nominal damages against Defendant(s) named in their individual capacities.

## ATTORNEY'S FEES

45. Plaintiffs are entitled to reasonable attorney's fees, costs, and litigation expenses pursuant to 42 U.S.C. § 1988.

## CONCLUSION

For these reasons, Plaintiffs respectfully ask this Court to:

1. Declare that the criminal trespass notices issued to Plaintiffs Carroll, Cohen, and Van Voorhis are unconstitutional on their face and as applied, in violation of the First and Fourteenth Amendments, against all Defendants;

2. Issue permanent injunctive relief, enjoining all Defendants from enforcing the criminal trespass notices and directing Defendants to rescind and void them;

3. Award compensatory and nominal damages against Defendant(s) named in their individual capacities for their personal role in directing the arrests and issuing the criminal trespass notices in violation of Plaintiffs' constitutional rights; no damages are sought against the TSPB board member Defendants sued in their official capacities;

4. Award attorney's fees, costs, and litigation expenses pursuant to 42 U.S.C. § 1988; and

5. Award all other relief to which Plaintiffs are entitled at law or in equity.

DATED: May 4, 2026

Respectfully submitted,

 /s/ Brian McGiverin
Brian McGiverin
Texas Bar No. 24067760
brian@austincommunitylawcenter.org

AUSTIN COMMUNITY LAW CENTER
2080 E. Ben White Blvd, Ste 240 PMB 5960
Austin, TX 78741
Telephone: (512) 596-0226
Fax: (512) 597-0805

ATTORNEY FOR PLAINTIFFS